IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JOSEPH L. MORALES DÍAZ,**<br>   Plaintiff,<br><br>   v.<br><br>**JULIO ROLDÁN CONCEPCIÓN,** *et, al.*,<br>   Defendants. | Civil No. 22-cv-1319 (BJM) |

**OPINION AND ORDER**

Plaintiff Joseph L. Morales Díaz ("Morales Díaz") sued Julio Roldán Concepción (Roldán), Abdiel Fantauzzi ("Fantauzzi"), Annette Montalvo ("Montalvo"), Wilfredo Del Valle ("Del Valle") (collectively "the individual Defendants"), and the municipal government of Aguadilla ("Aguadilla") under 43 U.S.C. § 1983 for violating his First and Fourteenth Amendment rights. Dkt.1. Further, he brought state law claims under Puerto Rico's Constitution, Puerto Rico Civil Code Article 1536, 31 L.P.R.A. § 10801, and Puerto Rico Law 90-2020, 29 L.P.R.A. § 3111, *et seq. Id.* Aguadilla moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 8(2)(a). Dkt. 6. Morales Díaz opposed. Dkt. 11. The individual Defendants also moved to dismiss and to join Aguadilla's motion. Dkt. 15. Morales Díaz responded by pointing to his previously filed opposition and stating his arguments opposing the individual Defendants' motion were identical. Dkt. 16. This case is before me on consent of the parties. Dkts. 27, 28.

For the following reasons, Defendants' motions to dismiss are **GRANTED IN PART** and **DENIED IN PART.**

**BACKGROUND**

The following facts are drawn from the complaint, Dkt. 1, and are assumed to be true for the purposes of this motion. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (at the motion to dismiss stage that "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible").

In September 2020, Morales Díaz was appointed to Aguadilla's Office of Municipal Emergency Management as a career employee. Dkt. 1 ¶ 29. During his employment, he took various courses offered by the Federal Emergency Management Agency ("FEMA") and was a certified rescuer. *Id.* He was also studying to be a lawyer by taking night classes at Interamerican University's Aguadilla campus. *Id.* ¶ 30. Additionally, Morales Díaz was an active member of the New Progressive Party ("NPP") and supported its candidate, then-mayor Yanitsia Irizarry ("Irizarry"), in her 2020 reelection campaign. *Id.* ¶ 31. However, after a recount, the State Election Commission determined Irizarry's opponent, Popular Democratic Party ("PDP") candidate Julio Roldán Concepción, won the election by around 50 votes. *Id.* ¶ 33. Upon becoming Aguadilla's new mayor, Roldán appointed Fantauzzi as Director of the Emergency Management Department, Montalvo as Director of Human Resources, and Del Valle as Director of Public Works. *Id.* ¶ 34.

On his first day as head of the Emergency Management Department, Fantauzzi, who worked on the recount for Roldán, asked Morales Díaz if he had worked on the recount for Irizarry. *Id.* ¶ 35. Morales Díaz replied that he had. *Id.* Fantauzzi then immediately reassigned Morales Díaz to sit in a chair at the entrance of the Emergency Management Department's offices and write down the names of people who arrived requesting services. *Id.* Morales Díaz spent two weeks performing this task, which had never previously been assigned to anyone, before being transferred to the sewage cleaning brigade. *Id.* ¶¶ 36–38. After Morales Díaz was reassigned to clean sewage, no one was appointed to his post writing down the names of visitors and nothing was done with the list he made. *Id.* ¶ 37. The week after he was transferred to the sewage brigade, Morales Díaz was transferred to the tree-trimming brigade. *Id.* ¶ 39. A week later, he was transferred again, this time to the street-cleaning brigade. *Id.* ¶ 40. He never received written notice of these changes. *Id.* When Morales Díaz asked Fantauzzi why he was the only employee who had worked on three

different brigades in the preceding three weeks, Fantauzzi mockingly replied that those were the orders of Irizarry, the former mayor. *Id.*

Next, Fantauzzi told Morales Díaz he was implementing rotating shifts that would require Morales Díaz to work several nights. *Id.* ¶ 42. Morales Díaz complained this change would conflict with his studies and Fantauzzi replied that Morales Díaz needed to realize there was a new administration and there were no privileges for any member of the NPP. *Id.* ¶ 43. When Morales Díaz said Aguadilla should support its employees taking night classes, Fantauzzi responded that Morales Díaz could take his complaint to Human Resources or, better yet, resign. *Id.*

Morales Díaz sought a meeting with Montalvo, the Director of Human Resources, which took place in Mayor Roldán's office. *Id.* ¶ 44. However, Mayor Roldán was not present. *Id.* The Vice Mayor, Maviael Morales, Montalvo, and Fantauzzi attended. *Id.* During the meeting, Fantauzzi told Montalvo that Morales Díaz did not like to follow his guidelines and was a disrespectful employee. *Id.* ¶ 45. Fantauzzi insisted on changing Morales Díaz's responsibilities weekly and asking him to work night shifts, despite their effect on his studies. *Id.* Morales Díaz told Montalvo he had never disrespected Fantauzzi and always followed guidelines, but wanted to continue his studies and did not see why he was the only employee whose responsibilities changed weekly. *Id.* ¶ 46. Montalvo responded by telling Morales Díaz it was clear to her that he did not want to realize the NPP lost the Aguadilla mayoral election, he needed to follow instructions, and there was no reason why Aguadilla needed to arrange his work schedule to allow him to continue his night classes. *Id.* Echoing Fantauzzi, Montalvo told Morales Díaz he could resign if he was unsatisfied. *Id.* Morales Díaz told Montalvo it was clear to him she did not support employees who wanted to achieve their educational goals and that he already knew the NPP had lost the elections. *Id.* ¶ 47. Montalvo responded that her decision was final. *Id.* ¶ 48.

Maviael Morales, who the complaint refers to as both Vice Mayor and City Administrator, left the meeting and returned a few minutes later stating it would be best to assign Morales Díaz to the Department of Tourism and Culture so he could continue his studies. *Id.* He then informed Morales Díaz he would receive a prompt notification of his transfer. *Id.* Instead, two to three weeks later Morales Díaz received a letter stating had been transferred to the Public Works Department. *Id.* ¶ 49. When Morales Díaz asked HR Director Montalvo why he was being transferred to Public Works, and not Tourism and Culture as had been discussed, Montalvo responded that this was the instruction of Mayor Roldán. *Id.*

Morales Díaz began work at the Public Works Department, where he reported to Del Valle. *Id.* ¶ 50. Del Valle told him working at the Public Works Department was almost like working at the State Election Commission. *Id.* ¶ 50. Del Valle had also worked on the recount at the State Election Commission representing then-candidate Roldán. *Id.* Like Fantauzzi, Del Valle assigned Morales Díaz to a different brigade each week. *Id.* ¶ 51. Over six weeks, he assigned Morales Díaz to brigades tasked with asphalting, debris and rubble collection, garbage collection, cleaning the town square, cleaning the baseball fields, painting yellow lines dividing streets, collecting recyclable material, and cutting branches. *Id.* He then repeated this rotation by cycling Morales Díaz back to the asphalt brigade. *Id.* Morales Díaz was the only employee assigned to a different brigade each week and during some weeks he was assigned to two brigades. *Id.* ¶ 51. When he complained, Del Valle said assignments were his decision and Morales Díaz should not waste time complaining to HR Director Montalvo because Del Valle had her support and Mayor Roldán's support. *Id.* ¶ 52. He then told Morales Díaz he might find a more sympathetic ear for his complaint if he took it to his boss, former mayor Irizarry. *Id.*

Case 3:22-cv-01319-BJM   Document 29   Filed 03/03/23   Page 5 of 18

*Morales Díaz. v. Roldán Concepción et al.*, Civil No. 22-1319 (BJM)                                                     5

In May 2021, Morales Díaz requested a leave without pay to continue his studies and escape the alleged harassment, and this petition was denied. *Id.* ¶ 53 That July, he requested leave for the same reasons and it was denied again. *Id.* ¶ 54. On August 24, he resigned stating the harassment due to his political affiliation had affected him emotionally. *Id.* ¶ 55–56. On September 8, Mayor Roldán accepted his resignation, but said he did not accept Morales Díaz's stated reason. *Id.* ¶ 57.

## APPLICABLE LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernández*, 640 F.3d at 12. The plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary" for the action. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). In evaluating a motion to dismiss, the court first discards any "'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The remaining "[n]on-conclusory factual allegations" are fully credited, "even if seemingly incredible." *Id.* The court engages in no fact-finding and does not "forecast a plaintiff's likelihood of success on the merits." *Id.* at 13. Rather, it presumes that the facts are as properly alleged by the plaintiff and draws all reasonable inferences in the plaintiff's favor. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Taken together, the facts pleaded must "state a plausible, not a merely conceivable, case for relief." *Ocasio-Hernández*, 640 F.3d at 12.

On a Rule 12(b)(6) motion to dismiss, a court may not ordinarily consider any documents that are outside of the complaint or expressly incorporated therein unless the motion is converted into one for summary judgment. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Rivera-Torres*

*v. Castillo*, 109 F. Supp. 3d 477, 482 (D.P.R. 2015). "However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3–4. "And a court ordinarily may treat documents from prior state court adjudications as public records." *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000).

## DISCUSSION

### I. Section 1983

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Courts determine Section 1983 liability by examining "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 558 (1st Cir. 1989) (further citation omitted). Acting under color of state law requires that a "defendant in § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

Further, "[m]unicipalities may be sued directly under section 1983 for monetary, declaratory, and injunctive relief." *Concepción v. Municipality of Gurabo*, 560 F. Supp. 2d 139, 141 (D.P.R. 2008) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690

(1978)). However, they are not liable for the constitutional violations of municipal employees pursuant to the doctrine of *respondeat superior. Monell*, 436 U.S. at 691. Instead, "[u]nder § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) (citing *Monell*, 436 U.S. at 694). A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a person with final policymaking authority. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–24 (1988).

Here, at all relevant times, Defendants were employed by Aguadilla and acted in their official capacities. Dkt. 1 ¶¶ 34–57. Further, the alleged conduct occurred within the scope of Defendants' employment because Defendants perpetrated the alleged injurious acts while conducting their official duties. *Id.* Additionally, the individual Defendants acted under color of state law when the purported conduct transpired because the alleged discrimination was committed by employees of Aguadilla during their employment. *See Camacho Ortiz v. Municipio de San Juan*, 2021 WL 1202839 at *5 (D.P.R. Mar. 29, 2021). Further, as a municipality, Aguadilla may be sued directly under section 1983 for monetary, declaratory, and injunctive relief. *See Concepción*, 560 F. Supp. 2d at 141. Thus, Section 1983 is an appropriate avenue to remedy Morales Díaz's claims against the individual Defendants and Aguadilla. I now analyze whether Morales Díaz has plausibly alleged constitutional violations by Defendants.

### A. The First Amendment

The First and Fourteenth Amendments protect individuals' right to freely associate with others "for the common advancement of political beliefs and ideas." *Kusper v. Pontikes,* 414 U.S. 51, 56–57, (1973) ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.").

Under the First Amendment, government officials may not take an adverse employment action against a public employee because of the employee's political affiliation, unless political loyalty is a legitimate requirement for the position in question. *See Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75–76 (1990); *Branti v. Finkel,* 445 U.S. 507, 516–518 (1980); *Elrod v. Burns,* 427 U.S. 347, 372–73 (1976) (plurality opinion). Subject to the latter exception, government officials cannot discharge public employees simply because of their political affiliations. *See Elrod,* 427 U.S. at 350. Additionally, "[p]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan,* 497 U.S. at 75 (rejecting the view that "[o]nly those employment decisions that are the 'substantial equivalent of a dismissal' violate a public employee's rights under the First Amendment") (citing *Rutan v. Republican Party of Ill.,* 868 F.2d 943, 954–957 (7th Cir.1989)). The First Amendment protects the freedom of government employees to associate with a political party, limiting the government's rights to interfere with said beliefs, except in the most compelling circumstances. *Rutan*, 497 U.S. at 76.

To make out a prima facie First Amendment political discrimination claim, plaintiffs must prove: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." *Lamboy-Ortiz v. Ortiz-Velez,* 630 F.3d 228, 239 (1st Cir.2010) (citing *Welch*, 542 F.3d at 938). To survive the motion to dismiss stage, a plaintiff must make a fact specific showing that his political affiliation was a substantial or motivating factor in the employment decision. *See Peñalbert-Rosa v. Fortuño-Burset,* 631 F.3d 592, 594 (1st Cir. 2011) (citing *Montfort-*

*Rodríguez v. Rey-Hernández,* 504 F.3d 221, 224–25 (1st Cir.2007)). As discussed below, Morales Díaz has alleged sufficient facts to satisfy the *Lamboy-Ortiz* inquiry at the motion to dismiss stage.

The first prong of the inquiry requires Morales Díaz to demonstrate that he and Defendants have opposing political affiliations. At this stage, it is sufficient for him to allege he and Defendants affiliate with different political parties. *See Ocasio-Hernandez,* 640 F.3d 1 at 13; *Caraballo v. Puerto Rico*, 990 F. Supp. 2d 165, 174 (D.P.R. 2014). Morales Díaz alleges he is an active member of the NPP and that he participated in the November 2020 elections. Dkt. 1 ¶ 17. Meanwhile, he contends Mayor Roldán is affiliated with the PDP and is its president in Aguadilla. *Id.* ¶ 19. Further, he alleges the remaining individual Defendants are active members of the PDP. *Id.* ¶¶ 21–23. Accordingly, Morales Díaz's factual allegations satisfy the first prong of the inquiry.

Under the second prong, Morales Díaz must show that Defendants were aware of his political affiliation with the NPP. On his first day of work, Fantauzzi allegedly asked Morales Díaz if he had worked on the recount for NPP candidate Irizarry and Morales Díaz replied that he had. Further, when Morales Díaz complained to HR Director Montalvo, she told him it was clear to her that he did not want to realize the NPP lost the Aguadilla mayoral election. When Morales Díaz complained to Del Valle about his constantly rotating assignments in the Public Works Department, Del Valle told him to take his complaints to his boss, former mayor Irizarry. Additionally, Del Valle said assignments were his decision and Morales Díaz should not waste time complaining to Montalvo because Del Valle had her support and Mayor Roldán's support. Morales Díaz thus satisfied the second prong of the inquiry because he alleged facts which, taken as true under Rule 12(b)(6), demonstrate Defendants were all aware of his NPP affiliations.

Under the third prong, Morales Díaz must point to an adverse employment action. "[S]howing that an employer transferred, demoted, or failed to promote an employee will suffice."

*Caraballo*, 990 F. Supp. 2d at 176. *See also Rutan,* 497 U.S. at 75 ("[P]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."). Morales Díaz alleged he was transferred from working a regular work schedule to working on rotating shifts, including night shifts. His allegations thus satisfy prong three of the analysis. *See Caraballo*, 990 F. Supp. 2d at 176.

Fourth, as reviewed above, Morales Díaz alleges Defendants repeatedly cited his political affiliation while taking adverse employment actions and responding to his complaints. For example, when Morales Díaz complained to Fantauzzi about the constantly rotating assignments, he alleges Fantauzzi responded that these were ordered by former Mayor, and NPP member, Irizarry. Montalvo and Del Valle also cited Morales Díaz's NPP affiliation when he raised concerns about his repeated transfers. Though he cites no interaction with Mayor Roldán, both Montalvo and Del Valle allegedly told Morales Díaz that Roldán supported their retaliatory behavior. Taken as true, this shows he suffered an adverse employment action solely because of his affiliation to the NPP. *See id.* (finding same where plaintiffs alleged defendant "stressed that Plaintiffs would learn a lesson now that the PDP was in power").

Lastly, "[u]nder Puerto Rico law, the actions of a mayor 'constitute [ ] the official policy of the municipality.'" *Concepción*, 560 F. Supp. 2d at 142 (quoting *Cordero v. De Jesus-Mendez*, 867 F.2d 1, 7 (1st Cir.1989)) (alteration in original). Because Mayor Roldán's actions constitute an official policy of Aguadilla, the municipality can be held liable for those actions under 43 U.S.C. § 1983. *See Welch*, 542 F.3d at 941 (citing *Monell*, 436 U.S. at 694). Accordingly, Defendants' motions to dismiss Morales Díaz's First Amendment claim are **DENIED.**

**B. The Fourteenth Amendment**

Morales Díaz alleges Defendants' actions violated his procedural due process rights grounded in the Due Process Clause. Among other things, the Fourteenth Amendment prohibits

states from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Property interests are not created by the Constitution, but rather "stem from an independent source such as state law." *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 6 (1st Cir. 2000). Once a state confers a property interest in public employment, it may not deprive an individual of said interest without due process of law. *Id.*

In Puerto Rico, "a public employee may have a property interest in his continued employment, . . . but not in the particular functions of his job." *Rojas-Velazquez v. Figueroa–Sancha*, 676 F.3d 206, 212 (1st Cir. 2012) (internal citations omitted) (collecting cases). "Under the Due Process Clause of the Fourteenth Amendment, persons who possess a property interest in continued public employment cannot be deprived of that interest without due process of law." *Figueroa-Serrano*, 221 F.3d at 5. This court has recognized that an employee who alleges a constructive discharge *may* have a procedural due process claim. *Camacho-Morales v. Caldero*, 68 F. Supp. 3d 261, 297 (D.P.R. 2014) (nevertheless granting summary judgment for failing to show resignation was involuntary where plaintiff attempted to rescind resignation). In the constructive discharge context, "[a] person who is told repeatedly that []he is not wanted [and] has no future . . . would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 97 (1st Cir. 2018) (quoting *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 655 (7th Cir. 2000)).

Here, Morales Díaz alleges the consistent rotation of his job duties and schedule constituted a constructive discharge from his career position. When Fantauzzi took charge, Morales Díaz was reassigned to sit in a chair and write down the names of visitors for two weeks. Then he was transferred to the sewage brigade, tree-trimming brigade, and street-cleaning brigade. Then he was

given a rotating schedule that interfered with his night classes. When he raised the issue, he was told to talk to HR or quit. He began with the first option and HR Director Montalvo told him, if he was unsatisfied, he could quit. After this encounter, he was then transferred to the Public Works Department, where the rotating schedule continued. When he raised the issue, he was told to take it up with his boss, former Mayor Irizarry, who Mayor Roldán had recently replaced. Taking Morales Díaz's allegations as true, and drawing all reasonable inferences in his favor, it is at least plausible that he saw the writing on the wall. "[C]onstructive discharge protects the employee who 'decides to quit rather than wait around to be fired.'" *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 51 (1st Cir. 2008) (quoting in parenthetical *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998)). Thus, Morales Díaz has plausibly pled that his supervisors engaged in a pattern of harassment making his working conditions "so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *Id.* at 50 (quoting *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 117 (1st Cir.2004)). As discussed above, because Morales Díaz alleged Mayor Roldán either engaged in or approved of the harassment, Aguadilla can likewise be held liable under 43 U.S.C. § 1983.

Accordingly, Defendants' motions to dismiss Morales Díaz's Fourteenth Amendment claim are **DENIED.**

## II.  Qualified Immunity

The individual Defendants argue they are entitled to dismissal under the doctrine of qualified immunity. Dkt. 15 at 13–17. To determine whether a defendant is entitled to qualified immunity courts examine "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.

2009). Whether a right is clearly established is a two-step inquiry. First, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Second, focusing concretely on the facts of the particular case, courts examine "whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* Thus, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional" *Id.*

Addressing the first step of the qualified immunity analysis, Morales Díaz has sufficiently alleged a violation of a constitutional right. As discussed, he has averred that Defendants violated his First Amendment rights by harassing him due to his political beliefs and affiliations. Dkt. 11 at 10–12. Further, he has alleged Defendants violated his Fourteenth Amendment rights because this pattern of harassment due to his beliefs amounted to a constructive discharge from his public employment, in which he held a property interest. *Id.* at 12–14. Taking these facts as true, Morales Díaz has alleged violations of his First and Fourteenth Amendment rights. Thus, the first prong of the qualified immunity analysis is met. *See Sauri-Cortes v. Fortuño-Burset*, 2011 WL 13351287 at *8 (D.P.R. Nov. 9, 2011) (finding plaintiffs who alleged Puerto Rico governor fired them due to political party affiliation satisfied this test).

Moreover, "a reasonable defendant would have understood that his conduct violated [Morales Díaz]'s constitutional rights." See *Maldonado*, 568 F.3d at 269. Faced with allegations that Puerto Rico's newly elected governor terminated employees due to political beliefs, this court previously held "a reasonable defendant would have known that it was unconstitutional to terminate even one, non-trust, non-policymaking employee on the basis of how they cast their ballot in the prior election." *Sauri-Cortes*, 2011 WL 13351287 at *8 (D.P.R. Nov. 9, 2011).

"Although resignation is ordinarily not a discriminatory act, when a resignation constitutes a constructive discharge, it is considered a discriminatory act." *Gonzalez Garcia v. P.R. Elec. Power Auth.*, 214 F. Supp. 2d 194, 204 (D.P.R. 2002). A constructive discharge can arise from, among other things, reassignment with significantly diminished job responsibilities, or a decision causing a significant change in benefits. *See, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Allegations that a newly elected mayor and his staff harassed employees of the opposing political party to encourage them to quit their positions suffice to defeat a qualified immunity defense at the motion to dismiss stage. *See Hernandez Carrasquillo v. Rivera Rodriguez*, 281 F. Supp. 2d 329, 335 (D.P.R. 2003).

Taking Morales Díaz's allegations as true, Mayor Roldán and his appointees assigned Morales Díaz, a FEMA-certified rescuer, to be a greeter and write down the names of visitors. Then, they rotated him each week for several months to various tasks unrelated to his training, creating work conditions so intolerable that he had no choice but to resign. All of this was due to his political affiliations protected by the First Amendment. Though Morales Díaz was not fired, unlike the plaintiffs in *Sauri-Cortes*, he alleges his harassment amounted to a constructive discharge. As this court held in *Hernandez Carrasquillo*, a reasonable official would have understood that either explicit or implicit approval of this harassment would violate an employee's constitutional rights. Thus, a reasonably prudent defendant would have had fair warning that his approval of and engagement in this behavior would deprive Morales Díaz of his constitutional rights.

Therefore, at this stage, the individual Defendants' request for qualified immunity is **DENIED**.

### III.     Aguadilla's Liability

Aguadilla makes two additional arguments for dismissal that I address below.

**A. Fed. R. Civ. P. 8(a)(2)**

Aguadilla first argues Morales Díaz's compliant fails to comply with Fed. R. Civ. P. 8(a)(2). Dkt. 6 at 9. Under this provision, a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Aguadilla avers Morales Díaz's complaint fails this test because it does not explain whether he is challenging a city policy or presenting a claim grounded in a custom to support his section 1983 claim. Dkt. 6 at 9. The complaint states, in part, "[a]n action by defendant, mayor Julio Roldán-Concepción, as the nominating authority of the Municipal Government of Aguadilla, constitutes the official policy of the Municipality and as such the Municipal Government of Aguadilla is liable to plaintiff." Dkt. 1 ¶ 20. The complaint thus explicitly addresses Aguadilla's concern regarding Morales Díaz's theory of liability.

Aguadilla also directs my attention to *Belanger v. BNY Mellon Asset Mgmt., LLC*, 307 F.R.D. 55, 58 (D. Mass. 2015), which states, "'[d]ismissal [for noncompliance with Rule 8] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised,' such that it would be 'unreasonable to expect defendants to frame a response to it.'" *Id.* (quoting *Sayied v. White*, 89 Fed. Appx. 284 (1st Cir.2004)). The *Belanger* court dismissed a rambling 462-page complaint along with its 393 exhibits. *Id.* Again, though Aguadilla may have wished for additional clarification of the claims against it, Morales Díaz's 18-page complaint with no exhibits is not comparable to the one at issue in *Belanger*. Further, "[o]ur federal rules promote the disposition of claims on the merits," not technicalities. *Kuehl, v. F.D.I.C.*, 8 F.3d 905, 908 (1st Cir. 1993)

(citing *Foman v. Davis,* 371 U.S. 178 (1962)). Accordingly, Aguadilla's motion to dismiss under Fed. R. Civ. P. 8(a)(2) is **DENIED**.

### B. Failure to Identify Policy or Custom

Reframing its Rule 8 argument, Aguadilla contends Morales Díaz's complaint warrants dismissal because it fails to name a municipal policy or custom that caused his alleged injuries. Dkt. 6 at 8. As discussed, Morales Díaz avers that actions of Aguadilla's mayor, Julio Roldán Concepción, subject the municipality to liability. Dkt. 1 ¶ 20. Specifically, he argues Aguadilla's mayor and director of human resources were aware of and perpetuated the harassment and hostile work environment he endured due to his political beliefs. Dkt. 11 at 9.

"Under Puerto Rico law, the actions of a mayor 'constitute [ ] the official policy of the municipality.'" *Concepción*, 560 F. Supp. 2d at 142 (quoting *Cordero*, 867 F.2d at 7) (alteration in original). A Puerto Rico municipality thus "is liable as a matter of law for an unconstitutional discharge of its municipal employees by the Mayor." *Id.* (quoting *Cordero*, 867 F.2d at 7). A mayor's employment decisions, including the unconstitutional discharge of municipal employees, thus constitute the official policy of the municipality. *Rivera-Torres v. Ortiz Vélez,* 341 F.3d 86, 103 (1st Cir. 2003).

Here, like the plaintiffs in *Concepción*, Morales Díaz alleged Mayor Roldán was a high ranking official in the municipality and that he committed acts that constituted discriminatory treatment. For example, he alleged that Mayor Roldán participated in the retaliatory actions of transferring him to the Public Works department, instead of Tourism and Culture, and rotating him to a different brigade each week. Dkt. 1 ¶¶ 49, 52. He then alleges Aguadilla violated the terms of his employment contract by constructively discharging him. *Id.* ¶¶ 58, 74. His allegations, taken as true, give rise to claims that can potentially entitle him to relief against Aguadilla. *See*

*Concepción*, 560 F. Supp. 2d at 142 (denying municipality's Rule 12(b)(6) motion for identical reasons); *Hernandez Carrasquillo*, 281 F. Supp. 2d at 336 (denying motion to dismiss where plaintiff alleged newly elected mayor and staff harassed them due to their political affiliation). Accordingly, Aguadilla's argument that Morales Díaz failed to name a policy or custom is without merit.

## IV. Puerto Rico Claims

Because the federal claims against defendants survive the motion to dismiss, I will exercise supplemental jurisdiction over all Commonwealth claims in the interests of judicial economy and efficiency. With one exception, discussed below, defendants offer no other argument for dismissing Morales Díaz's Puerto Rico law claims. *See* Dkts. 6 at 16–17; Dkt. 15 at 17. Accordingly, excluding Morales Díaz's Article 1536 claim, Defendants' motions to dismiss Morales Díaz's Commonwealth claims are **DENIED**.

### A. Article 1536 Claim

Puerto Rico amended its Civil Code in 2020. In this amendment, the general tort statute moved from Article 1802 to Article 1536. Thus, much of the case law applying Article 1536 references Article 1802.

The Puerto Rico Supreme Court has repeatedly held that, "[a]s a general rule, in the face of conduct by an employer that has been typified and penalized by special labor legislation, the employee only has recourse to the relief of said Act, and is barred from seeking additional compensation under Article 1802 of the Civil Code." *Rosario v. Valdes*, 2008 WL 509204 at *2 (D.P.R. Feb. 21, 2008) (quoting *Santini Rivera v. Serv. Air, Inc.*, 137 P.R.D. 1, 16 (1994)). Thus, "to the extent that a specific labor law covers the conduct for which a plaintiff seeks damages, he is barred from using that same conduct to also bring a claim under Article 1802." *Id.* Such a claim

"may only be brought by the employee-plaintiff if it is based on tortious or negligent conduct distinct from that covered by the specific labor law(s) invoked." *Id.*

Morales Díaz bases his Article 1536 claim and his Law 90-2020 claims on the same factual allegations. Law 90-2020 makes it unlawful to engage in workplace bullying. 29 L.P.R.A. § 3111, *et seq.* As such, Morales Díaz is precluded from bringing suit under Article 1536. *See Cotto v. Municipality of Aibonito* 2012 WL 1110177 (D.P.R. Apr. 2, 2012) (dismissing Article 1802 claim that overlapped with Law 100 political discrimination claim). Thus, Defendants' motions to dismiss his Article 1536 claim are **GRANTED**.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED IN PART** and **DENIED IN PART.**

Defendants' motions to dismiss Morales Díaz's First and Fourteenth Amendment claims are **DENIED.** Further, the individual Defendants' request for qualified immunity is **DENIED**.

Excluding Morales Díaz's Article 1536 claim, Defendants' motions to dismiss his Commonwealth claims are **DENIED.** Their motions to dismiss his Article 1536 claims are **GRANTED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of March 2023.

S/ *Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge